Estelle JORDAN, et al.

v.

Lawrence MEDLEY, et al., Appellants.

No. 82–1577.

United States Court of Appeals,
District of Columbia Circuit.

Argued March 16, 1983.

Decided June 14, 1983.

212

Dwight D. Murray, Washington, D.C., with whom David P. Durbin, Washington, D.C., was on the brief, for appellants.

Audrey F. Gorman, Washington, D.C., with whom Edward J. Gorman, Jr., Washington, D.C., was on the brief, for appellees.

Before MIKVA, EDWARDS and SCALIA, Circuit Judges.

Opinion for the Court filed by Circuit Judge SCALIA.

SCALIA, Circuit Judge:

The appeal in this diversity case is taken from the district court judgment entered upon a jury verdict following the second trial; the first trial ended in a hung jury. The judgment awarded appellees, Estelle Jordan and William Graham, compensatory damages totalling $11,500, and punitive damages totalling $22,500, against appellants Kathleen and J.M. Medley, and their son, Larry, on claims of assault and intentional infliction of emotional distress. The claims rest upon the allegation that Larry Medley, while acting within the scope of his employment by Mr. and Mrs. Medley, brandished a loaded semi-automatic rifle at appellees during an argument concerning a rental increase on Mrs. Jordan's apartment. We consider three questions: (1) whether the trial court erred in instructing the jury that Larry Medley was acting within the scope of his employment at the time of the incident; (2) whether there was sufficient evidence of participation, authorization or ratification to support an award of punitive damages against Mr. and Mrs. J.M. Medley; and (3) whether Larry Medley's deposition statement that he had been charged with criminal assault in connection with the incident was properly admitted at trial.

Mrs. Jordan and Mr. Graham were tenants in an apartment building owned jointly by Mr. and Mrs. J.M. Medley. Larry Medley assisted his father and mother part-time with the management of the building, a job which included maintenance, repair work, response to complaints and other routine managerial chores. (Tr. 271). On the morning of the incident, Larry Medley and his father drove to the apartment building to deliver to Mrs. Jordan written notification that her rent was to be increased and to drop off William Ford, another employee, to cut the grass. (Tr. 280). Mr. Medley and Larry Medley delivered the notification to Mrs. Jordan, who took it inside her apartment to read. (Tr. 9). Within moments, she returned to her porch and began to question Mr. Medley about whether a mistake had been made, claiming they had earlier agreed to a rental increase below

that reflected in the notification. The manner of her questioning—whether polite or bellicose—was disputed (Tr. 281–82). In any case, the elder Medley did not respond much if at all. (Tr. 85; 282). Instead, there followed a heated exchange between Larry Medley and Mrs. Jordan, including a fair amount of profanity and name-calling on both sides. At some time during the exchange, Mrs. Jordan tore up the notice and, depending upon whose testimony is believed, either dropped the pieces to the ground (Tr. 11; 85; 358), or threw them in the elder Medley's face. (Tr. 282; 400). Soon after, Larry Medley and his father left the premises.

In about an hour, they returned to pick up Mr. Ford. Mrs. Jordan emerged from her apartment to rekindle the argument, this time accompanied by her nephew and his German shepherd-collie. (Tr. 92; 146). In the course of this second exchange, Mr. Medley pointed his finger at Mrs. Jordan, uttering words to the effect that she should get back in her apartment and shut up. (Tr. 17; 291). Again depending on whose testimony is believed, Mrs. Jordan pushed his finger away (Tr. 17; 105) or slapped it until "it hurt," (Tr. 401) and smacked him in the face (Tr. 291). At this, Larry Medley took his father by the arm and walked him back to their truck, which was parked behind the apartment building. There, he took from its carrying case a semi-automatic rifle that had been left in the truck, and loaded it with one clip of ammunition. He returned to the steps of Mrs. Jordan's apartment, where he took up the argument with Mrs. Jordan (who was soon joined by appellee Graham (Tr. 199)), in the presence of other residents of the apartment building. There was conflicting evidence on whether he ever actually brandished the rifle or pointed it at appellees or any of the bystanders. (Tr. 295; 336; 348; 377). In any event a neighbor, having observed his return from the truck with the rifle, had telephoned the police. (Tr. 22; 233). The police arrived in a short time, and arrested Larry Medley.

## I. J.M. and KATHLEEN MEDLEY

### Scope of Employment

The doctrine of *respondeat superior* makes an employer liable for those torts of his employees committed within the scope of their employment. According to the District of Columbia courts:

> To be within the scope of employment, the conduct of the servant must be of the same general nature as that authorized or incidental to the conduct authorized.

*Presley v. Commercial Credit Corp.,* 177 A.2d 916, 918 (D.C.Mun.App.1962) (footnote omitted); *accord, District of Columbia v. Davis,* 386 A.2d 1195, 1203 (D.C.App.1978).

In cases such as this, where the employee's action is alleged to involve an intentional tort, incidental to the conduct authorized, the law of the District of Columbia is less than entirely clear. In 1977 we found the rule to be as follows:

> In the District of Columbia, " '[u]nless an assault, or other tort, is actuated in part at least by a purpose to serve a principal, the principal is not liable.' "

*International Distributing Corp. v. American District Telephone Co.,* 186 U.S.App. D.C. 305, 308, 569 F.2d 136, 139 (1977), *quoting from Meyers v. Nat'l Detective Agency,* 281 A.2d 435, 437 (D.C.App.1971), *quoting in turn from M.J. Uline Co. v. Cashdan,* 84 U.S.App.D.C. 58, 59, 171 F.2d 132, 133 (1948). In more recent cases, however, the District of Columbia Court of Appeals has noted with apparent approval a "trend ... to extend liability for intentional torts to situations where the employment provides a 'peculiar opportunity and ... incentive for ... loss of temper.' " *Penn Central Transportation Co. v. Reddick,* 398 A.2d 27, 31 (D.C.App.1979), *quoting from* W. Prosser, LAW OF TORTS § 70 at 466 (4th ed. 1971).

It is possible (as the excerpt from Prosser apparently intends) to apply this "foreseeability" principle as a substitute for the requirement of intent to further the employer's business. It is also possible, however, to use it not for that purpose but rather for the purpose of liberalizing only

the second independent requirement for vicarious liability—viz., that the tort committed with the intent to further the employer's business also be at least "incidental" to conduct that the employer has authorized. (Quite obviously, a bank teller who shoots a bank examiner with the intent of serving his employer's interest does not impose liability upon his principal, no matter *how* much the act was meant to further the bank's interest.) Thus, those sorts of altercations that are foreseeable are ipso facto "incidental to authorized conduct"—though it is still a condition of employer liability that the employee be actuated, at least in part, by a desire to serve his principal's interest. It is in the latter sense that this court (interpreting D.C. law) has applied the foreseeability principle. *Compare Lyon v. Carey,* 174 U.S.App.D.C. 422, 424, 533 F.2d 649, 651 (1976), *with International Distributing Corp. v. American District Telegraph Co.,* 186 U.S.App.D.C. 305, 308, 569 F.2d 136, 139 (1977).

We think that the D.C. Court of Appeals cases subsequent to our opinion in *International Distributing Corp.* seek to use the foreseeability principle in the same fashion—though the latest of them is somewhat ambiguous. Thus, in *Penn Central, supra,* even while endorsing the foreseeability "trend" described by Prosser, the D.C. court reaffirmed that "[t]he employer will not be held liable for those 'willful acts, intended by the agent only to further his own interest, not done for the [employer] at all.'" 398 A.2d at 31, *quoting from Nelson v. American-West African Line, Inc.,* 86 F.2d 730, 731 (2d Cir.1936), *cert. denied,* 300 U.S. 665, 57 S.Ct. 509, 81 L.Ed. 873 (1937). And in *Waldon v. Covington,* 415 A.2d 1070, 1074

n. 13 (D.C.App.1980), it again asserted that vicarious liability for an intentional tort requires that "'the master's affairs were being furthered by the employee's conduct'", *quoting from Penn Central, supra,* 398 A.2d at 30. The D.C. court's most recent case, *Johnson v. Weinberg,* 434 A.2d 404 (D.C.App.1981), contains language that seems more compatible with an approach that would substitute foreseeability for intent to further the employer's business;[1] but that is arguably inconsistent with other language of the opinion[2] and unquestionably inconsistent with the opinion's strong reliance upon our decisions in *Lyon v. Carey* and *International Distributing Corp., supra.* In a case decided last June, well after publication of the *Johnson* opinion, we reaffirmed our holding in *International Distributing Corp.* that under D.C. law "foreseeability must be combined with a purpose to further the employer's interest." *Hoston v. Silbert,* 681 F.2d 876, 880 (D.C.Cir.1982). That opinion did not cite *Johnson,* but we see no reason to depart from its conclusion.

In accordance with the above-described principle of D.C. law, the crux of J.M. and Kathleen Medley's defense at trial was that, although they were Larry Medley's employers, they were not liable for his conduct because it was motivated not by a business but by a personal interest. They moved on this ground for a directed verdict at the close both of the plaintiffs' case and of all the evidence, and for judgment notwithstanding the jury verdict. At appellees' request, however, the trial court instructed the jury that

the employee, Larry Medley, was engaged upon the business of the employers, J.M. and Kathleen Medley, at the

---

1. It is true that an employer will not be deemed liable for the intentional torts of an employee which are committed solely in furtherance of the latter's own interests, and not those of the employer. However, in viewing this narrower question—an employee's intentional tort—it is equally clear that where a tort is the outgrowth of a job-related controversy, "then the employer remains liable, since the master and servant relationship is not broken." . . . The critical question to be resolved is whether the conduct in question

was foreseeable as being within the range of responsibilities entrusted to the employee.
434 A.2d at 408, *quoting from Penn Central, supra,* 398 A.2d at 30 (citations omitted).

2. "Whether the assault . . . was the outgrowth of a job-related controversy *or simply a personal adventure of* . . . [*the employee*], was a question for the jury."
434 A.2d at 409 (emphasis added), *quoting from* Lyon v. Carey, *supra,* 174 U.S.App.D.C. at 424, 533 F.2d at 651.

time of the incident. Therefore, the employers are responsible for any negligent acts or omissions of their employee, although the employers are entitled to the benefit of any defense which is available to the employee.

(Tr. 434).

The first problem with this instruction is that it relates to negligence, whereas the employee's alleged tort in the present case was intentional.[3] Nonetheless, neither party objected to the instruction on this ground below, and since it was the only portion of the instruction that addressed the *respondeat superior* issue, we must assume that it controlled the jury's determination on that point. Appellants' objection when the instruction was given, and their sole contention with respect to the instruction on this appeal, is that its effect was to direct a verdict against J.M. and Kathleen Medley on the scope of employment issue. This was error, they assert, because the evidence presented would have permitted reasonable jurors to conclude that Larry Medley's conduct was not actuated by a purpose of serving his employer.[4]

We think it clear that the instruction did amount to a directed verdict on the issue. This is evident not only from its terms but from the trial judge's comment in response to appellants' objection, that scope of employment is a "legal question and not a jury question." (Tr. 441). A directed verdict was appropriate only if, viewing the evidence and all reasonable inferences in the light most favorable to the employers, a reasonable juror could only conclude they

were liable. *See Johnson v. Weinberg,* 434 A.2d 404, 407–08 (D.C.App.1981); *Great A & P Tea Co. v. Aveilhe,* 116 A.2d 162, 164 (D.C.Mun.Ct.App.1955). Before examining the evidence on this point, we may note that the District of Columbia courts have considered it to be the general rule that scope of employment presents a jury question. *See, e.g., Penn Central Transportation Co. v. Reddick, supra,* 398 A.2d at 32. Moreover, the relatively few District of Columbia cases that we have found sustaining directed verdicts on this issue have all involved verdicts in favor of the employer. *See Great A & P Tea Co., supra; Park Transfer Co. v. Lumbermens Mutual Casualty Co.,* 79 U.S.App.D.C. 48, 142 F.2d 100 (1944); *Penn Central Transportation Co. v. Reddick, supra. Cf. International Distributing Corp. v. American District Telegraph Co., supra.* A directed verdict against the employer would be particularly rare in the case of an intentional tort, which by its nature is willful and thus more readily suggests personal motivation.

The evidence in its light most favorable to J.M. and Kathleen Medley included the following: that Mr. Medley, aged 75, was in frail physical condition and had been in and out of the hospital (Tr. 299); that Mrs. Jordan subjected Mr. Medley to extreme verbal abuse, including curses and profanity (Tr. 281–82; 285–87); that she threw the pieces of the torn-up rent increase notice in his face (Tr. 406); that she shouted and cursed in a loud voice close to his face (Tr. 290–91); that she repeatedly

---

**3.** We are informed by appellees, and it appears to be correct, that the instruction is drawn directly from Instruction 6–2 of the Standardized Jury Instructions for the District of Columbia, with the exception that the word "incident" was substituted for the word "accident." Instruction 6–2 is to be given when vicarious liability of an employer for negligence is at issue and "agency" or "scope of employment" is conceded by the employer. Here, J.M. and Kathleen Medley conceded that Larry Medley was an "agent" of theirs at the time of the alleged assault, in the sense that he was in their employ (Tr. 251); they did not, however, concede that in committing the alleged assault he was acting as their agent or acting within the scope of his employment. It was this very

distinction upon which their entire defense rested. Even had "agency" or "scope of employment" in the sense intended by Instruction 6–2 been conceded, we would still be at a loss to understand the relevance of the instruction, given that negligence was not an issue in the case.

**4.** Appellees contend that appellants should not be heard to complain of the instruction since the objection was not raised until after the instruction had already been given. We know of no such prohibition. In fact, Fed.R.Civ.P. 51 specifically permits objection to the charge until the jury retires.

smacked his hand and slapped him in the face until "it hurt" (Tr. 291; 401). These facts would permit a jury to conclude that Larry Medley's subsequent action was not prompted by any intent to serve the interest of his employer as such, but was a personal reaction to insult and abuse directed against his father.

The evidence also showed the following: that on an earlier occasion Mrs. Jordan and Larry Medley had had a personal altercation in connection with his removal of a spotlight she had installed on the back of her apartment (Tr. 133; 276); that in connection with that altercation she threatened to "make sure [he] never worked over there again" and said "she'd have something for [him] when [he] came back over there to work again" (Tr. 277); that on the occasion here in question Larry Medley and Mrs. Jordan directed verbal abuse and racial epithets against one another (Tr. 13; 15; 280; 282–83; 285–86); and that Mrs. Jordan once again threatened, "You come back here and I'll have something for you" (Tr. 282–83). These facts too would permit a jury to conclude that Larry Medley's subsequent action was not prompted by any intent to serve his employer, but was entirely the consequence of a personal animosity, amply reciprocated, towards Mrs. Jordan.

■ Finally, the very nature of the alleged tort—assaulting an unarmed woman with a loaded, semi-automatic rifle—at least permits the imputation of purely personal motivation. " 'The outrageous quality of an employe's [sic] act may well be persuasive in considering whether his motivation was purely personal.' " *Penn Central Transportation Co. v. Reddick, supra,* 398 A.2d at 31, *quoting from Ochsrider v. Reading Co.,* 172 F.Supp. 830, 832 (E.D.Pa.1959).

The trial court therefore erred in taking the scope of employment issue away from the jury. Because that issue was dispositive of Mr. and Mrs. Medley's liability for compensatory damages, the case must be remanded for new trial on that claim.

*Punitive Damages*

Appellants moved under Fed.R.Civ.P. 50(b) for judgment notwithstanding the verdict on several grounds, one of which was that there was no evidence upon which the jury could find J.M. and Kathleen Medley liable for punitive damages. Appellants also allege error in the denial of that motion.

■ An award of punitive damages is impermissible without a valid basis for compensatory damages. *See Franklin Investment Co. v. Smith,* 383 A.2d 355, 358 (D.C. App.1978). Since, for the reasons discussed above, a new trial must be held on the latter point, the award of punitive damages must be set aside as well. *Id.* Because the same issue is likely to arise on retrial, however, we address briefly the trial court's denial of this aspect of the Rule 50(b) motion, on the assumption that compensatory damages could properly have been sustained on the record before us.

■ As the name suggests, the purpose of punitive damages is to punish a wrongdoer, and thus to deter similar action in the future. That purpose is not served by the imposition of such charges upon a person who is responsible for the tort only vicariously, without any personal blame. Thus, in the District of Columbia, a principal will not be held liable for punitive damages for his agent's conduct without a showing that he "participated in the doing of such wrongful act or had previously authorized or subsequently ratified it with full knowledge of the facts." *Safeway Stores v. Gibson,* 118 A.2d 386, 388 (D.C.Mun.App.1955) (footnote omitted), *aff'd,* 99 U.S.App.D.C. 111, 237 F.2d 592 (1956); *accord, Woodard v. City Stores Co.,* 334 A.2d 189 (D.C.App. 1975); *Dart Drug v. Linthicum,* 300 A.2d 442 (D.C.App.1973).

■ Here, there was no evidence that Mrs. Medley participated in her son's tortious conduct. The only conceivable basis for imposition of punitive liability upon her was authorization or subsequent ratification. Appellees say they carried their burden on this score. They point to the fact

that, with her husband, she was a joint owner of the apartment building and to testimony that it was her responsibility to "take[ ] care of the books" on the rent (Tr. 6; 272; 398); that when Mr. Medley was sick, Mrs. Medley would become involved in the management of the apartment building (Tr. 398); and that Larry Medley was retained in the employ of the Medleys after the incident, a fair inference being that this was done with Mrs. Medley's knowledge. General participation in a business, however, is no indication that the participant has personally authorized or ratified an intentional tort that is (at most) incidental to authorized conduct. And at least in the District of Columbia, retention in employment—indeed even retention *and* promotion—do not suffice to establish ratification. *See, e.g., Woodard v. City Stores, supra,* 334 A.2d at 191; *Dart Drug v. Linthicum, supra,* 300 A.2d at 444; *see also, Safeway Stores, supra,* 118 A.2d at 389 and cases cited.[5]

The punitive damages ruling as to J.M. Medley, on the other hand, was correct. Although he did not actually participate in the alleged assault, the fact that he remained at the truck while his son took out the rifle and walked back to confront Mrs. Jordan could be construed as indication of his authorization or ratification. A reasonable jury could conclude that absence of authorization or ratification would have been manifested by some noticeable action on his part—pulling or calling his son back—which none of the witnesses observed. We note, however, that on retrial it will be necessary to instruct the jury, as they were not instructed here, on the necessity that they *find* participation, authorization or ratification before awarding punitive damages against either employer.

## II. LARRY MEDLEY

We turn next to the allegations of error with regard to the judgment against Larry Medley. Logically, this is prior to the issues already discussed, since vicarious liability of the principal can hardly be sustained if the agent was not properly found to have committed the tort. *See New Orleans & Northeastern R.R. v. Jopes,* 142 U.S. 18, 24, 27, 12 S.Ct. 109, 111, 112, 35 L.Ed. 919 (1891). We discuss this aspect of the case last, however, in the hope that our prior exposition of the clear, substantive reasons requiring a new trial of this matter insofar as only the employers are concerned may—in addition to providing guidance to the district court upon retrial—soften the unhappy appearance of our remanding the case for yet a third trial on what is (insofar as defendant Larry Medley is concerned) a purely evidentiary point.

Defendant Larry Medley raises two evidentiary claims, only one of which is substantial enough to warrant our attention. He asserts that the trial court erred in permitting plaintiffs' counsel to read to the jury, over his objection, the following excerpt from his deposition testimony:

Question: What did they [the D.C. police] charge you with?

Answer: I think it was assault with a dangerous weapon . . . .

(Tr. 254; 260).

Appellees' initial response to this basis of appeal is that appellant waived any right to object to this testimony at trial by failing to object to the eliciting of it in the deposition. The trial court found this argument persuasive (Tr. 248–59); erroneously so. Fed.R.Civ.P. 32(d)(3)(A) provides that "[o]bjections . . . to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time." Appellees assert

---

5. Appellees argue that retention of an employee in a small family business should be treated differently. We do not read the cited District of Columbia cases to turn, however, upon the employer's lack of knowledge that the tort-feasor employee has been retained—the only factor that could render the *size* of the business relevant to the ratification issue. As for the *family nature* of the business, that cuts, if anything, against a finding of ratification, since the employee-relative is more likely to be retained despite disapproval of his tort.

that if objection to the inquiry concerning criminal charges had been made at the time of the deposition, the inquiry could have been limited to criminal *convictions*. But such a resolution would have "obviated or removed" the objection only by simultaneously eliminating the testimony in question, which is evidently not what the Rule has in mind. On that basis all failures to object would produce a waiver, and the Rule's exception would be converted into an invariable rule. What the exception obviously envisions is a situation in which a timely objection (*e.g.*, on the ground of failure to lay an adequate foundation, *see Nutterville v. McLam,* 84 Idaho 36, 367 P.2d 576 (1961)) could have enabled the problem to be remedied so that *the same testimony* could be received in accordance with law.

Appellant's objection to the testimony was the obvious one: that in a case where he is defending against a claim of civil assault, evidence that he was charged by authorities with criminal assault would unduly prejudice the jury against him. Resolving such an issue ordinarily involves weighing the prejudice created by official censure (arrest, indictment or even conviction) against its probative value. That inquiry in turn requires an assessment of what the censure was intended to prove. In the present case the trial record gives no indication of the intended purpose of the proffered testimony. In their brief on appeal, appellees say it was "elicited to show that although Larry Medley faced certain charges he was able to plead to one of the charges and therefore escape any incarceration." Brief at 19. We fail to see how this has any bearing upon whether Larry Medley assaulted the present plaintiffs. Seeing no other conceivable purpose for the testimony, we assume it was elicited to show that an assault in fact had been committed.

■■■ The traditional common-law rule is that even a criminal *conviction* is not admissible in a civil trial to establish the occurrence of the act to which the conviction pertained. *See Chantangco v. Abaroa,* 218 U.S. 476, 31 S.Ct. 34, 54 L.Ed. 1116 (1910). Although this rule has been sub-

stantially modified in recent years, *see generally,* 18 C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure: Jurisdiction* § 4474 (1981); 2 S. Gard, *Jones on Evidence* § 12:25 (6th ed. 1972), to our knowledge no court has suggested that a mere criminal *charge* can be admitted for that purpose. It is well established that evidence of arrest or indictment is inadmissible for the purpose of impeaching a witness in criminal cases. *See Michelson v. United States,* 335 U.S. 469, 482, 69 S.Ct. 213, 221–22, 93 L.Ed. 168 (1948) (dictum); *United States v. Fox,* 473 F.2d 131 (D.C.Cir. 1972). Some courts have held that this proscription applies equally in civil proceedings, *see, e.g., Smith v. Leflore,* 293 Pa.Super. 149, 437 A.2d 1250 (1981); *Wentworth v. State,* 33 Md.App. 242, 364 A.2d 81 (1976), and there is forceful dictum to that effect in the opinions of this court, *see, e.g., Fenwick v. United States,* 102 U.S.App.D.C. 212, 214, 252 F.2d 124, 126 (1958); *Sanford v. United States,* 98 F.2d 325, 327 (D.C.Cir. 1938) (per curiam). The rationale for this rule is that:

> Arrest without more does not, in law any more than in reason, impeach the integrity or impair the credibility of a witness. It happens to the innocent as well as the guilty.

*Michelson v. United States, supra,* 335 U.S. at 482, 69 S.Ct. at 222. *See also United States v. Maynard,* 155 U.S.App.D.C. 223, 227, 476 F.2d 1170, 1174 (1973); *Jackson v. United States,* 377 A.2d 1151, 1155 (D.C. App.1977). That rationale applies with at least equal force when, as here, evidence of arrest or charge is introduced not merely to impeach but to establish the actual occurrence of the offense to which the arrest or charge pertained. Admission of the testimony was therefore error.

We must ask, finally, whether wrongful admission of the testimony affected appellant's "substantial rights," *see* 28 U.S.C. § 2111 (1976); Fed.R.Evid. 103; Fed.R. Civ.P. 61; or was instead harmless error. That inquiry involves an assessment of the likelihood that the error affected the outcome of the case. *See United States ex rel.*

*D'Agostino Excavators, Inc. v. Heyward-Robinson Co.,* 430 F.2d 1077, 1083 (2d Cir. 1970), *cert. denied,* 400 U.S. 1021, 91 S.Ct. 582, 27 L.Ed.2d 632 (1971). As the Supreme Court has described the test: "[I]f one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).[6] Application of this test is highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected, *see id.* at 763, 66 S.Ct. at 1247; *Carona v. Pioneer Life Ins. Co.,* 357 F.2d 477, 480 (5th Cir.1966); and the centrality of that issue to the ultimate decision, *see Charter v. Chleborad,* 551 F.2d 246, 249 (8th Cir.), *cert. denied,* 434 U.S. 856, 98 S.Ct. 176, 54 L.Ed.2d 128 (1977). In the present case, where the improperly admitted testimony went directly to the central issue of the case (whether appellant Larry Medley had committed an assault), and where the evidence on that issue was closely balanced (as the hung jury in the first trial would suggest), we do not have the necessary assurance that the jury's judgment was not substantially swayed. Accordingly, the judgment must be set aside with regard to Larry Medley as well as with regard to his principals.

For the reasons stated, we reverse and remand for a new trial.

*So ordered.*

---

**6.** *Kotteakos,* a criminal case, acknowledges that although the "substantial rights" test applies to both civil and criminal cases, that "does not mean that the same criteria shall always be applied" to those separate categories. 328 U.S. at 762, 66 S.Ct. at 1246. Nonetheless, the formulation of *Kotteakos*—if not the same application of that formulation—is used by this court and others to determine effect upon "substantial rights" in civil cases. *See, e.g., Schneider v. Lockheed Aircraft Corp.,* 658 F.2d 835, 844 (D.C.Cir.1981); *Conway v. Chemical Leaman Tank Lines,* 525 F.2d 927, 929 n. 3 (5th Cir.1976); *Cohen v. Franchard Corp.,* 478 F.2d 115, 125 (2d Cir.1973).